Good morning, ladies and gentlemen. We have five cases on the docket today, three of which are set for argument. The first two are from the PTAB and the third is from the Court of Veterans Affairs. The first case up is in Re Karpf and I understand that Mr. Hurt, you'd like to save five minutes for rebuttal, is that correct? That's correct, Your Honor. Okay. All right, you may begin. Thank you, Your Honor. May it please the Court, my name is Christian Hurt. I represent Dr. Karpf. There are both substantive and procedural issues of this appeal. I'd like to start with the substantive issues this morning, but I'm happy to address any of the other issues that the panel would like. This case involves electronic medical record database systems. There are two sets of patent patient-specific claim limitations that are absent from the prior reference that may I would reference. Dr. Karpf's 067 patent application claims limitations relating to patient access of the medical database record system and certain patient-specific data being stored in that system. In contrast, the May I would reference only discloses medical access to the system. So Dr. Karpf's system has a patient program that a patient accesses using a patient password and a separate medical personnel program that a doctor... Counsel, what's the difference here in the access? Obviously the prior May I would provides access and apparently only to be able to, so the patient can control who else has access. But it seems to me that at that point the patient has to have access to the information in order to designate whether somebody else can have access to it. Isn't that what your patent or your application discloses? No, it's a little bit different. The patent discloses there's two things. There's access and there's control and Dr. Karpf's 067 application distinguishes between the two of them. So the access is through the patient password, control is through the patient PIN, and the doctor uses the patient PIN to access the medical record. But there's actually, in the May I would reference, there's only patient control. So the patient provides a passcode to a doctor, the doctor uses that passcode to access the patient's medical information, but there's nothing in the reference that the patient himself or herself actually can log in. But if the patient is the one with the password, why couldn't the patient then log in and use the password? Well, because it's not actually a password. All it is is an additional level of security that a doctor uses. So the patient doesn't have the key to get through the front, through the first door. The thing the patient has is it will allow a doctor to open that particular patient's record once in the system, but the patient doesn't have the key to open that particular patient's record once in the system. Does your password, is it required in order to have access for the records? Which password? The medical password? The medical password. In Dr. Karpf's patent or in the prior reference, in the May I would reference? In the application. So in the patent application, the medical personnel has to have a separate medical password and on top of that, a patient PIN. So the medical password gets them in the first door, the patient PIN gets them the patient's medical record. And what does the patient have? The patient has a separate patient password. The patient does not use the patient PIN. The patient has his or her own password and username and enters that name into a separate patient program and accesses the system. I'm looking at your claim 23. Yes, Your Honor. There is a reference to patient password, but there's nothing that really seems to explicitly require patient access. Show me where the patient access is. So in claim 23, you're right, it's a little bit broader in the sense that it doesn't specifically delineate a patient program and specific access requirements, but the patient password itself, if you look at the specification, is what the patient uses to access the system. But there isn't the same level of, you're absolutely right, there isn't the same level of detail in terms of a patient program through which the patient accesses the information, but there is a patient password that is required for the patient to actually access it. But it just says storing the patient password. So this is an article of manufacture. It's an apparatus claim, so it doesn't, even if the written description otherwise discusses this patient access system, there is no reference to that in this claim itself, is there? That's correct. And I would go back to the Board's decision, though. The Board's decision focused on claim 9 and didn't break out claim 23 the way Your Honor did, and specifically only said that claim 9 was anticipated for the same reasons claim 23 was, so that that analysis wasn't done by the Board. So if we think that there's a distinction between the two claims, are you saying that we would need to send 23 back for additional, if we agree with you on claim 9, do we have to send 23 back? Or you're saying that we automatically have to agree with you on claim 23 as well? Well, I would think that the Court would have to reverse on claim 23, because the Patent Office has taken the position that the two horizons fall together. None have broken it out the way Your Honor just did. But I agree from reading the plain language of the claims. There isn't that level of detail in claim 23 that there is in claims 9 through 18. Well, what argument would you have that my odd doesn't disclose all of the elements of claim 23? I disagree. So in addition to the patient access issue, there's actually a few other limitations that are expressed in claim 23. So you're relying on those. But if we disagree with you on those, there's nothing, the access one seems the hard one to me. And it seems hard with 9, but it doesn't seem particularly hard with 23, because it doesn't mention access. Right, but there is no actual patient password disclosed in my odds, so there's no patient password that a patient uses to access the system. And I guess the question is, did the patient access record codes disclosed in column 10 constitute a patient password or not, or if that's substantial evidence. I would argue it's not, given the distinction between. Can I ask you about my odd a little bit? I don't quite understand exactly what you think it discloses versus what the Patent Office thinks it discloses. Do you think my odd allows a patient to actually sit down to some kind of terminal or computer and then enter a code and then look at his or her prescription information and check off which doctors can see which prescriptions, or is it more on the lines of when somebody goes to their pharmacy, their doctor, or their other doctor and says, here's my access code, you can look at my prescriptions? I think it's closer to the latter. Now, the reference is a long reference, and on that particular point, it's pretty sparse. And what it says in column 10 is the latter of what Your Honor mentioned, that a patient access record code controls access by a doctor, and the patient would give that code to the doctor. Is it a closer call? I understand that point. The one thing that troubled me about that from my odd is that it seems to suggest  so that maybe the pharmacist can see everything and one doctor can only see a portion and one doctor can only see a portion, another portion. And if that's correct, it would seem to imply access to some kind of database and at least a list of prescriptions that the patient has. Is that correct? That's not disclosed in the reference. I can see how you're getting there. I mean, what is disclosed is that, as I read, especially column 10. Let's assume I agree that that's disclosed in the record. That comes pretty close to anticipating your claims, doesn't it, because it allows a patient to access a database that has a list of prescriptions that probably have diagnoses or some reason for this prescription, and it allows them to manipulate the data. It may not go quite as far as your invention, but it seems pretty close to me. What's distinguishable there? Well, the distinguishment is that the patient in Dr. Karp's 067 application actually has access to the medical record and access to his information, whereas in Mayotte it's a third party, it's a doctor. There's control of that information, but the patient in hers is your honor. But I guess my hypothetical assumed that they could actually see a list of prescriptions, and the prescription itself usually has some kind of, for X condition, do this and prescribe this. That seems like medical information to me. It may not be other medical information, but it seems pretty close to what you're describing. I think that's correct, but that's not disclosed in the Mayotte reference. It's a prescription management system. Every figure is for a doctor to log into. There's no disclosure of a patient being able to do that. You're saying the patient cannot view the prescriptions under Mayotte? Not in the computer system. There's no disclosure. As I understand your point, then, is that these different levels of controls are, for instance, I can say that the pharmacist can look at all of my medical information relating to my cancer, but I don't want the pharmacist to look at the medical information relating to something else, and that doesn't mean I have the same computer access to that. That's right. You have access to your health information by virtue of the fact that you know your health conditions. The question is do you have access to that information in the computer system, and that's exactly right. Putting aside the new matter rejections before we get into your rebuttal time, let's talk about, I mean, I guess one of the toughest pieces for you is the notion that there would be these software terminals available or computer terminals available sort of in the lobby of a medical facility, and so if it's sitting in the lobby, why would the doctor need it to be in a lobby as opposed to a patient perhaps wanting it in a lobby? That's right. I agree that's one of the more difficult aspects of the reference, that it distributes the patient interface components sort of all over the place, either point of care in the lobby or other places, but there's still no express disclosure of access by the patient. Still, I think the most you can read into it is that a patient in the lobby could essentially swipe their card and select Dr. Jones. There's nothing about them actually. I mean, if this were such a key piece of the reference, you'd think it would be in one of the 20-something figures or more thoroughly disclosed in the 50-something columns of this reference. So I think the most that one of the ordinary people in there would read into it is just that the patient could essentially swipe the card and select the doctor because the background of this, too, is there's the FDA laws and the HIPAA laws, and people who are skilled in the medical field are aware of those, and those expressly prevent and limit who can prescribe medicine and who can view people's medical records. And so if a patient could log into this system as described in figures 1 through 15, it would allow them to prescribe medication to themselves or other people and view other people's medical records. But that's not necessarily true. I mean, it could be set up with different permissions, and when a patient logs in, their password only entitles them to access to their own records. The thing that troubles me about this, and this computer terminal is particularly it, if a patient is logging into a computer terminal, what other purpose would it be than to see a list of their prescriptions and say X doctor can see this one and X doctor can see that one? Well, I don't think they're swiping their cards. I don't think they're actually logging into it. They're using their patient record access cards or control cards at that terminal. I don't think they actually go and log into the database system. There's no disclosure. What are they doing at the terminal once they swipe their card? Well, and then the next question is would they actually be able to select specific prescriptions with specific doctors? And there's no disclosure of that. All it says is they can restrict access to who treats them, and that's in the specification that the patient in Mayotte is the patient that authorizes specific doctors. There's nothing that's sort of mapped out. Are you suggesting that what's really happening is that there's some kind of reader or something that when somebody goes to the doctor's office, they swipe the card, and that allows that doctor's office to suddenly access their records? That's one of the embodiments here. I mean, the problem is I understand, and I'm into my rebuttal time, so I understand we're on substantial evidence review, but it's the patent officer's job to make the rejection, and all of those arguments, all of the hypotheticals your Honor made, they're not in the reference. I agree this would be a much better obviousness rejection, but then they'd have to go through and make a Graham case that they didn't make. Could you briefly address the new grounds of rejection argument and how our case Biedermann fits into that? Sure. So it's a little bit tricky because it happened on rehearing. So the board relied on Column 10 in the original decision. In no time during prosecution was Figure 16 that Judge Hughes was just mentioning, at no point in time was that basis of a rejection. I understand it's the same reference, but this isn't an instance where, like in DBC, Column 10 has a sort of broad disclosure, and Figure 16 fleshes it out. Column 10 just has a code, and Figure 16 includes computer terminals and other things. Dr. Karp never had the opportunity to respond to that before the board. So if the court found that Column 10 was insufficient evidence to uphold the patient access rejection, if you disagree with me that Figure 16 lacks that evidence, we're entitled to go back to prosecution and Dr. Karp can amend the claims and respond to that rejection. Okay. Thank you. We'll give you back your full five minutes. Thank you, Your Honor. Good morning. May it please the Court. Karp is reading the prior act reference in one way, and the PTO is reading the reference in another way. The way the PTO is reading the reference is the more reasonable way to read it, and at minimum is supported by substantial evidence. Let me ask you to start where we ended, which is the new grounds for rejection. I mean, it does seem a little odd that on rehearing you come up with a whole new portion of the written description that has never been cited to you before, that the examiner never relied upon, but you don't give the applicant an opportunity to respond to it or even to amend. Why didn't you just send it back to the examiner and say, Column 10 is not enough, but look at other portions of the specification? It's not a new matter for a variety of reasons. I mean, first of all, the Board on Rehearing did cite it as an example. They said Mayood further discloses patient access. And then they say, for example, Figure 16. And also, he has responded to the argument. The thrust of the argument, the rejection hasn't changed. And all along, Mayood, the fight has been about patient access. Let's assume that I disagree with you on Column 10, and that at that point the examiner's support I find to be lacking, but that Column 46 and Figure 16 do raise some additional, at least areas for thought and analysis. Why isn't it unfair to let the Board go off on that at rehearing without giving either the applicant or the examiner an opportunity to address it? I think in this particular case, even if it is a new rejection, which I don't see it being, it is harmless. In his blue brief, he's making the same arguments that he made prior. In his blue brief, when he talks about the software and the interface, Karp is saying the same exact thing as before, that, oh, it's only control, and that, oh, these are only used to choose a doctor. So the argument wouldn't change. All right, well, let's talk about your belief that this is all about patient access. You know, beginning at the beginning, the abstract says that this is a system for physician use, and everything in the description of the invention contemplates physician use. It allows the patient to restrict access by giving them the ability to only allow certain physicians to access it. But given that the entire thrust of the invention is for physician use, is it your view that patient access is expressly discussed or just possible? The examiner and the Board both made findings that it is disclosed, and they were relying on what the reference teaches and what inferences one of skill in the art would make. The examiner and the Board both pointed to at least three specific references that talk about the patient record access code, the patient terminals. The way that Karp is reading the reference is not the most reasonable way, because if you were just handing... Do you agree, though, that, I mean, in order for you to prevail, my odd has to show that the patient actually uses a database and can see his or her own information? I mean, the claim doesn't... That's a yes or no, I think. Yes. So can you point to specific substantial evidence that shows they can see their own information? I understand they have an access code, which might be reasonably, and you could reasonably infer that they can access the database, maybe. But where does it say they can see their own information, like their prescriptions and their diagnoses and things like that? Am I odd? In addition to, like, the column 46, which we already discussed, where you have the patient terminal, column 47 on the appendix in 349, you know, says that one of the functions of the host computer is to provide access control software and related data files for patients... What lines are you at? Oh, sorry. 45 and 46. So, and I guess the beginning part, you know, important functions maintained by the host computer include access control software and related data files for patients, care providers, and organizations. That's the host computer. I mean, how does that tie up to the patient terminal? I mean, clearly the host computer has information, because that's what the doctors use to control it. But I don't see anything in that that suggests that the patient has access to this. Right. I guess my reading of that is that it's, you know, data files to be seen. And the software is distinguished. You know, they've already talked about, you know, physician software, organization software, and patient software. So he does talk about three different software programs that allow, you know, varying levels of access. So going back and looking at IOD, when I go through the abstract and all of the language leading up to the claims themselves, I just don't see where a patient has access to their own information, where they can actually look at, for example, it's described as a first encounter with their physician and their own medical records. Can you show me where in the prior art I would find something like that? The reference doesn't explicitly go through those steps of saying that, okay, a patient logged on and is, you know, reviewing their medical data. But, you know, one of our nurses on the heart, looking at the reference, the inference is, you know, talking about, like, what else would the terminals be used for? Well, it could be used to, for example, a patient can control who has access to the information, but that doesn't mean that the patient itself has access to the information. Right, but, I mean, I think the reasonable way of reading it is that if you, like, why would they set up these terminals and these software if all you're doing is giving the doctor the code? You know, I think there is enough disclosure in my IOD about allowing patients to have access. You seem to be making an argument of obviousness, not anticipation. We're looking at anticipation, and each limitation of the application has got to be met by the prior art. Right, and met or with inferences. You know, the PTO is allowed to rely on the inferences that you would have from the prior art, too, for an anticipation rejection. That's what I'm asking you. Show me where in my IOD we can make a reasonable inference, as you would have us do, that the patient has access to their own records, to the actual information. Okay, you know, 348, column 46, line 41 to 45, it says, the patient interface components of the patient-directed data access control are run at separate stations from the point-of-care locations, you know, for example, in reception areas. But again, it says used by prescribers. I mean, this is the problem. You start with the whole description of the invention. It says the prescription management system can be provided in software, single-user operation on a standalone personal computer for use, by example, a sole practitioner, multi-user operation on local area network for use by physicians and other prescribers within a single facility, hospital, group practice, or the like prescribing organization. And then you go back here, and that, then you're talking about prescribers. So everywhere that there is a reference to use or user, it's only physicians or prescribers. Respectfully, I mean, in view of Enrique Dali, even if you disagree about access, the substantial evidence, I mean, the reference can be read one way or the other, if the examiner and board have substantial evidence for their findings, the PTO should still prevail. But, I mean, substantial evidence means evidence. I mean, it just doesn't mean if the board wants to infer something that they can do it. I mean, if they think it's obvious, they should do an obviousness rejection and do the work. The... The examiner and the board, you know, pointed to a number of findings in Mayood that a reasonable person would read as allowing... So you pointed us to the one in column 46. Right. Let's move on. I mean, assume we don't agree with you on that. What else do you have? Okay. Okay. I mean, the patient record access codes that were discussed by the examiner in his original... The problem here is nobody disagrees that there's an access code that the patient has control over that he or she can use to give users of the system access. What you have to show us is that the patient, him or herself, can look at the medical data. And I just don't see it. I mean, the claim requires that there's access... allowing an access to the database through a patient program. So, I mean, given under broadest reasonable interpretation, it's not necessarily that they can see all of their data or see the same amount of data that they see in CARP reference. But they all have access to some data, don't they? Well, wait. First of all, you don't give the broadest reasonable construction to the prior art. Right. The prior art existing... Right now I'm talking about claim nine. Okay. So, wait. So you're saying in claim nine, what? Claim nine says that it's a method for allowing access to the EMR database through a patient program. In which an authorized patient has access only to information related to the authorized patient. Right. So that doesn't mean all of the medical information. It's just some information. You're saying it's only a part of the medical information. Do we still have anticipation? Yes. I mean, it only has to be that the patient can access some information. What case law do you rely on then? You only have to meet part of a limitation in order to anticipate. There's no case law about that, but we meet the full limitation. Can I ask you about claim 25? Sure. Even if we agree with you on everything else, where in the MIAD reference does it provide any kind of notification to a patient that a prescription hasn't been filled or something of the like? MIAD is all about notification to doctors. I don't see how claim 25 stands even if we agree with you on everything else. MIAD does disclose that once a doctor has gotten notification of an unfilled prescription, they can notify the patient of that. But the doctor does it. The system doesn't do it. Right. It's an article of manufacture. The notification says that it has to be given to the patient, but it could be via the doctor. So you think if MIAD sends some kind of alert to the doctor that the patient hasn't picked up the prescription in time and the doctor calls the person on the phone and says, you need to go pick up the prescription, that that anticipates? Yeah, the patient is still getting notification via... But not via the device. Right. They were supposed to be receiving the notification by way of the software. That's the whole point of the invention, so that the doctor doesn't have to pick up the phone and call them. I don't think the claims require that. I mean, it says given to the patient. It doesn't say how it's given to the patient. It doesn't say that it's sending a specific alert to the patient. Okay. Anything else? No. Thank you. I'd like to start, if I may, right where the panel left off on claim 25. Your Honor is exactly right. The notification has to come from the computer. The Patent Office just agreed that in Mayod, the only notification that's issued is directly from the doctor. So if we flip to claim 25, which is on JA-116, it's an article of manufacture claim. The Patent Office is right. But it's a dependent claim, and it depends on claim 24, which in turn depends on claim 23. And claim 23 is on JA-115, and it resides in the preamble, an article of manufacture comprising, and if you go down to the bottom, routing machine executable control program steps, the control program comprising the steps of. And so the claim makes it clear that the control program is what performs all of these steps in claim 23. And if you flip over to claim 25, it's a where in the storing step in claim 23 includes, and then the last one is in said issuing step includes issuing a notification. So I think the claims are very clear that it's the control program in the database that issues the notification, not the doctor. And the Patent Office, I just heard them say that they agree, Mayod does not disclose that. So I think even access aside, these other issues aside, I think claim 25 has to issue for lack of substantial evidence. On the access points, very briefly, the PTO said a lot about, well, one of ordinary skill in the art would understand this, and it's a reasonable inference on that. The Patent Office has the obligation to show where in the reference it discloses patient access to the medical records system, specifically information related to only the authorized patient for claims 9 through 18. The PACE law on inferences sounds a lot like inherency, but inherency, the question isn't, could the reference be constructed that way to perform that function? The question is, does it necessarily result from the face of the reference that the only thing it could do is what's inherent in the reference, what's inherent in the property, what's inherent in the disclosure? And that's not the case here. But if we send you back, what's the likelihood that you're not going to get an obvious rejection? I don't want to speculate on that. I think there's two issues with that. Lisa, if you're talking about the new ground of rejection, one of the things the Patent Office said is that our blue brief mirrored our briefs before the Board. Well, we never had an opportunity before the Board to amend the claims, and we never had the opportunity before the Patent Office to amend the claims. And I think, Your Honor, if there is an obviousness rejection, look, it would probably be more difficult on appeal. There's more deference. There's more factual issues. There's harder things. But this patent goes back, and my client's almost 70 years old, and he filed the original application on this patent in the 90s. And so we're not talking about is it obvious today in 2014. If you were wanting to clock back 15 years ago, they need to make that shown. And they never did. And I think if it goes back and there is an obviousness rejection, we'll deal with it then, either through amending the claims. How do you answer your opponent's argument that basically you're going to have to rely on the same arguments that are already contained in your brief and that you've already made? Well, I think there's two responses to that. One is the examiner never heard them. And the second one is even if the examiner upholds the new ground of rejection, my client will have the opportunity to amend the claims. And if by the time the rejection is made in the rehearing stage, the only opportunity we have is to come up on appeal and challenge it on substantial evidence or go back. At that point, the claims are fixed in. They would not be if we went back to the patent office. But like I said, this patent has already been, this application, at least from the parent on, I think this particular one has been at the patent office now for almost a decade. If we have to go back, we have to go back, but I think there's no substantial evidence to support the rejection that the PTO decided they wanted to make. They didn't make an obviousness rejection. They made an anticipation rejection. So I respectfully request that the court reverse the decision of the patent office. Thank you, Your Honor. Okay. Thank you.